UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------x
SANDRA BARON,

               Plaintiff,    :     REPORT & RECOMMENDATION

          -against-        :     11 Civ. 4262 (JGK)(MHD)

MICHAEL J. ASTRUE, Commissioner
of Social Security,        :

          Defendant.   :
--------------------------------x

TO THE HONORABLE JOHN G. KOELTL, U.S.D.J.:

     Plaintiff Sandra Baron has sued the Commissioner of Social Security to challenge a decision of the Social Security Administration ("SSA") which denied, in part, her application for an award of Social Security disability benefits and Supplemental Security Income benefits. Both parties have moved for judgment on the pleadings. For the reasons that follow, we recommend that the case be remanded to the SSA for further consideration.

BACKGROUND

I. The Procedural History

     Baron filed twin applications for disability and SSI benefits on April 9, 1990. Citing "stress, blackouts, back problems, left

1

hand problems [and] stomach" difficulties (Tr. 21, 62), she represented that she had become disabled as of January 12, 1989, and sought an award of benefits from that date forward. Since plaintiff's insured status expired on December 31, 1993, the pertinent period for her disability insurance claim was from January 12, 1989 to the end of 1993, and the period for her SSI claim began January 12, 1989 and continued through the date of the SSA's decision.

The SSA denied these applications initially and, again, on reconsideration. (Id. at 34-49). Plaintiff then asked for a hearing before an administrative judge. (Id. at 50-51). On April 10, 1991, Administrative Law Judge ("ALJ") Frederick Harap conducted a hearing on her applications, at which she appeared with her husband but no lawyer. The details of what transpired at that hearing are not directly in the record, as the transcript of that event could not be located. In any event, following the hearing, ALJ Harap issued a decision on May 21, 1991, finding that Mrs. Baron was not disabled, assertedly because she was able to perform her past relevant work, which was said to involve light exertion, as defined by SSA regulations. (Id. at 110-12). Plaintiff appealed that decision (id. at 113-14), but the SSA Appeals Council rejected her application on February 3, 1992. (Id. at 115-18). In the face of

2

the Appeals Council's adverse decision, Mrs. Baron did not pursue
court review at that time.

In the wake of the class settlement in <u>Stieberger v. Sullivan</u>,
792 F. Supp. 1376 (S.D.N.Y.), <u>modified</u>, 801 F. Supp. 1079 (S.D.N.Y.
1992), the SSA eventually determined that Mrs. Baron was a member
of the class, and thus entitled to reconsideration of her
application. She was apparently notified of this status by letter
dated January 29, 2003, and she requested further review. (Tr.
178). On reconsideration, the SSA again found her not to be
disabled. (<u>Id.</u> at 121-27).[1] Plaintiff was then afforded a hearing
before ALJ Frank Borda on November 2, 2004. At the hearing,
plaintiff again appeared with her husband, who advised the ALJ that
she need not testify. (<u>Id.</u> at 451-55). Following the hearing, the
ALJ issued a decision on December 23, 2004, in which he found
plaintiff not to be disabled. (<u>Id.</u> at 12-20). Plaintiff sought
review by the SSA Appeals Council, which again declined to disturb
the ALJ's findings. (<u>Id.</u> at 484-86, 487-90).

---

[1] Under the <u>Stieberger</u> settlement, if a claimant asks for
review of her claim, the administrative process starts at the
reconsideration stage, which precedes any hearing before an ALJ.
<u>Stieberger</u>, 792 F. Supp. at 1386.

Mrs. Baron then filed suit in this court. Baron v. Barnhart, 06 Civ. 5488 (WCC) (S.D.N.Y. filed July 20, 2006). On November 3, 2006, the SSA stipulated to a remand of the challenged decision for "further proceedings" (Tr. 492-93), a step that the subsequent ALJ attributed to his predecessor's failure adequately to advise Mrs. Baron of her right to appear and proffer evidence at the 2004 hearing. (Id. at 476, see also id. at 497-98). On remand, ALJ Dennis G. Katz conducted a hearing on December 15, 2008. Mrs. Baron, represented this time by counsel, appeared and testified, as did her husband. (Id. at 899-955). Following the hearing, ALJ Katz issued a decision finding (1) that plaintiff had not been disabled during the period of her insurance coverage, (2) that she first became disabled on April 22, 2003, (3) that she was not entitled to disability insurance benefits, and (4) that she was entitled to SSI benefits as of April 22, 2003, but not before. (Id. 482-83).

Mrs. Baron sought review by the Appeals Council, which declined her request. (Id. at 463-66, 456-58). This lawsuit followed. With the administrative record having been filed by defendant, both sides have moved for judgment on the pleadings. The focus of the dispute is on when plaintiff became disabled.

4

II. The Pertinent Record

The record reflects a litany of complaints by plaintiff --
both physical and psychological -- dating back to at least the late
1970s, as well as a long history of apparent personal hardships. It
also reflects intermittent assessments and treatments by health
care providers, sometimes separated by considerable time gaps
attributable to the fact that either no treatment was rendered or
the pertinent records were not unearthed. We summarize this record,
starting with the testimony of plaintiff and her husband before ALJ
Katz.

A. The December 15, 2008 Hearing Testimony

1. Mr. Baron

Mr. Baron testified first, with plaintiff not present,
assertedly because of the sensitivity of his testimony. (Id. at
925). He reported that he had married plaintiff in or around 1989,
and that, until 1988, Mrs. Baron had been living in Idaho with her
child, apparently from a previous relationship. He also recounted
that during that time both she and her child were sexually abused

by the child's grandfather. (Id. at 929-30).[2] Mr. Baron indicated that plaintiff was suffering severe emotional distress, at least in part as a result of that situation, and that he had invited her to come East and live with him. She did so, and they married several months later. (Id.). At the time they had five children between them. (Id. at 934).[3]

According to Mr. Baron, after Mrs. Baron's arrival in New York, she spent most of her time lying down and crying, and was unable to care for the children. As he described the situation, she "was very demanding, crying and verbally yelling at the kids 24/7... [and] wishing she was dead." (Id. at 931). He also mentioned that she suffered constantly from apparently severe headaches, as well as pain in "her neck and body," which lasted "all day" (id. at 931-33), and that these symptoms grew worse over time. (Id. at 933-34). When questioned about Mrs. Baron's physical capacities starting in the 1990s, Mr. Baron reported that she could not bend her neck, turn her head, or use her fingers, hands or

---

[2] As clarified by Mrs. Baron's testimony, the perpetrator was the child's paternal grandfather. (Tr. 955).

[3] We note that the record reflects inconsistencies as to the number of children each of these two sired. They had three children with each other, plus at least five from prior relationships. (Tr. 934).

arms. (<u>Id.</u> at 937). As he described matters, her headaches grew so severe that at times she banged her head against a wall and screamed that she wished that she were dead. (<u>Id.</u> at 933-34).

Mr. Baron further recited that although at some point in the late 1980s his wife had worked briefly as a cashier (<u>id.</u> at 935) and then had "tried to be a substitute teacher" in 1990 and 1991 (<u>id.</u> at 940), she was unable for most of the time to engage in any meaningful work activities as a result of pain (<u>id.</u> at 935-36) and that he, a retired, disabled former Marine and law-enforcement officer (<u>id.</u> at 939-40), had needed to take care of the children, as well as do the shopping and housework. (<u>Id.</u> at 934-35). He was assisted in the child-care tasks by a neighbor and by his teenage daughter. (<u>Id.</u> at 935). He also testified that his wife's inability to function, much less work, had continued up to the present. (<u>Id.</u> 939).

As for plaintiff's medical treatment, he recounted that, for a period of years in the 1990s, she had seen a Dr. Gupta for her physical maladies. (<u>Id.</u> at 932, 939). The doctor prescribed various medications for the pain, but according to Mr. Baron they were not very effective. (<u>Id.</u> at 933). Her treatment with Dr. Gupta ended in late 1995, following a complaint by Mr. Baron that Dr. Gupta was

7

relying too heavily on medications, which were not effective. (Id. at 937-38). Mr. Baron reported that his wife had also been treated at the Castle Point VA Hospital, beginning around 2001. (Id. at 936). When questioned about psychiatric treatment, he recited that he had asked his wife to seek such help but that she had refused because she was "in denial," and that Dr. Gupta had not referred her. (Id. at 939).


2. Mrs. Baron


Plaintiff also testified before ALJ Katz. She confirmed that for a period of about one year she had worked as a substitute teacher's aide, which involved being on call to come in to a school to assist in a classroom when requested to do so. (Id. at 942-43). She reported that even when called to come in, she had often been unable to do so because of severe migraine headaches and back pain. (Id. at 943, 951-52).


In summarizing her ailments, plaintiff listed migraine headaches, carpal tunnel syndrome, pains in her neck and lower back and irritable bowel syndrome ("IBS") or spastic colon. (Id. at 943-45, 950). She referred to having been treated by Dr. Gupta starting in 1990 and, before that, by a Dr. Garfinkel, who had ordered x-

8

rays, CT scans and MRIs of her cervical and lumbar spines. (Id. at 944). She testified that she had undergone physical therapy, which did not help, and had used ice and heat packs, and numerous medications. (Id. at 945). She reported that the many medications that she was prescribed did not provide major improvement, particularly with regard to her headaches, and that, even when medicated, she would lie on the bathroom floor in pain, crying and throwing up. At most, the medications took "a small edge off of some of the pain." (Id. at 945-46).

Mrs. Baron confirmed her husband's testimony that they had shared custody of six children, ranging in age from two to 14. She could not take care of them, and most of the work was done by her husband, by his 14-year-old daughter, and by a neighbor. (Id. at 946-47). Indeed, she said, her difficulties led to an inability even to change the baby's diaper, and sometimes the eight-year-old would do it for her. (Id. at 953). In addition, the two smallest of the children, as babies, each had a seizure disorder, one suffered from ADD, ADHD and ODD and one was autistic. (Id. at 954-55). She further reported that by 1990 or 1991 she could not hold a real job, and that her condition since then had, if anything, deteriorated, as she continued to suffer headaches and body pain, felt irritable and cried a lot. (Id. at 950).

9

Plaintiff also recalled, albeit vaguely, having a psychiatric evaluation at the VA. (<u>Id.</u> at 952). She reported having a poor memory, even to the point that, when answering a question posed to her, she might forget what the question was. (<u>Id.</u> at 952-53). She also confirmed her husband's testimony that she and her child had been sexually abused by the child's paternal grandfather in the 1980s in Idaho. (<u>Id.</u> at 955).

Apart from Mrs. Baron's testimony, she confirmed in her application for benefits that her work history had extended from 1976 to 1988. During that period she worked principally as a grocery checker and more briefly, in 1980, as a nurse's aide in a nursing home. (<u>Id.</u> at 66).

B. <u>The Medical Records: Treaters</u>

The earliest medical records in the administrative transcript date from 1984, when plaintiff, then living in Idaho, was already complaining of frequent, apparently severe, headaches. Various neurological tests, as well as a CT scan, EEGs and x-rays of cervical spine, proved negative for any physiological condition. (<u>Id.</u> at 93-99).

10

Another set of Idaho records date from 1987, when plaintiff was complaining principally of lower back pain, as well as dizziness, fainting, headaches, chest pain, and a variety of other apparently more minor aches and pains. (Id. at 100-01, 104). These documents reflect only that Mrs. Baron attended physical therapy for a period of time, but they contain no physician's assessments. (Id. at 102-03, 105). In addition, plaintiff herself reported in one of her applications that she had attended chiropractic sessions with a Dr. Wear starting in 1986 (id. at 63), although the record contains no documentation of that treatment.

After plaintiff moved to New York, she was seen and treated for cervix complications during a pregnancy in 1989. (Id. at 78-84). She therefore underwent a so-called cervical cerclage. (Id. at 82). The patient history also mentioned that plaintiff's parent had died following an unspecified accident. (Id. at 79). In contrast, a later psychiatric evaluation reported that plaintiff's father had died by suicide, while her mother had been killed by a drunken driver. (Id. at 352).

Plaintiff began seeing a physician named Abraham Garfinkel as early as 1990, apparently for continued back problems. (Id. at

11

76).[4] Dr. Garfinkel referred her to Dr. Prem Prakesh Gupta, a neurologist, who began seeing her in March 1991. (Id. at 89). Dr. Gupta's detailed report of his first examination mentions, as part of the history, that a fall by plaintiff in 1981 had precipitated chronic lower back pain, which she described as radiating into one or the other of her legs. She also complained of pain and numbness in both hands, a condition that she reported had begun three or four years before, as well as migraine headaches, accompanied by dizziness and occasional blackouts since childhood. (Id. at 89).

Dr. Gupta's physical examination found that plaintiff was about six months pregnant. He observed tenderness in the lower lumbar and sacral areas, and on both sides of the sciatic notch, as well as significant limitations in forward flexion (with pain at 60 degrees) and in lateral bending on both sides (at 20 degrees). (Id. at 90). As for plaintiff's hands, he observed her to have "positive Phalen's sign and positive Tinel's sign on both sides," an indication of carpal tunnel syndrome. (Id. at 90).[5] Although

---

[4] It bears mention that plaintiff was seen on November 30, 1990 at the Albany Medical Center, apparently for back pain, although the records are barely legible. (Tr. 180-83). At the time it was noted that plaintiff was pregnant. (Id. at 183).

[5] See Jonathan Cluett, Carpal Tunnel Syndrome: What are the Symptoms of Carpal Tunnel Syndrome?, About.com (Aug. 2, 2011), available at http.//orthopedics.about.com/cs/carpaltunnel/

plaintiff reported some tingling in both fingers and toes, all other physical tests were apparently within a normal range. (Id.).

Based on these findings, Dr. Gupta listed as his impressions that plaintiff was suffering from frequent vascular headaches, for which she needed treatment following the completion of her pregnancy, that she suffered chronic low back pain, possibly caused by bilateral lumbar radiculopathy or a herniated disk, and that she likely suffered from carpal tunnel syndrome causing pain in her hands. (Id.). His plan included obtaining a nerve conduction study, an EMG study, and a CT scan of the lumbosacral spine after pregnancy, and prescription of Elavil for the headaches. (Id. at 91). In a handwritten note, dated April 9, 1991, Dr. Garfinkel endorsed Dr. Gupta's findings. (Id. at 92).

There is no indication in the administrative transcript that the specified tests were carried out following the end of the pregnancy. Dr. Gupta apparently did not see plaintiff again until May 21, 1992. In the interim, on October 25, 1991, Mrs. Baron was seen on an emergency basis at the Community General Hospital in upstate New York by a Dr. Bernard Bloom, who reported that she was

---

a/carpaltunnel_2.htm.

wearing a neck collar and was complaining of "pain and burning in the cervical spine." (Id. at 334). Apparently she had a ceiling tile fall on the back of her neck, and an x-ray taken that day showed "a slight narrowing at the C5-C6 interspace, suggestive of osteo degenerative change." (Id. at 333). Dr. Bloom diagnosed her as suffering from a contusion, but also opined that she suffered from "aggravated arthritis." (Id. at 334).

When plaintiff was seen again by Dr. Gupta on May 21, 1992, she complained, as before, of numbness in her hands, low back pain and frequent headaches. (Id. at 310). She also mentioned pain in her "lower" neck that radiated down her spine and shoulder pain. (Id.). The doctor's examination detected crepitus in the left shoulder, "marked tenderness" over the "spinous process," a full range of motion of the shoulder, albeit with some pain on movement, mild tenderness in the lower back, straight leg raising to 90 degrees, and suppleness in the neck, but with pain on movement. The Tinel's sign was apparently equivocal, although plaintiff's wrists were tender. Other measurements were within normal limits. (Id.).

Dr. Gupta prescribed various painkillers, including Ansaid and Elavil, and referred plaintiff for a CT scan and x-rays. (Id.). The resulting June 3, 1992 x-rays and CT scan of the left shoulder

14

reported normal findings. (Id. at 302, 304). The CT scan of the lumbar spine found a mild disk bulge at L4-L5, but otherwise yielded a normal result. (Id. at 303, 305).

Dr. Gupta saw plaintiff again on June 17, 1992. (Id. at 311). He noted that she had been complaining of "diffuse" pain in her neck, left shoulder and lower back, as well as numbness in her hands. He added that she was now also complaining of numbness in her legs, and an inability to sit or to drive for extended periods. (Id.). He found that she had tenderness in the cervical spine and crepitus in both shoulders. He noted the results from the x-rays and CT scan, as well as the persistence of her headaches despite medication. He determined to try other medications -- including Inderal and Esgic -- to send her for physical therapy for her "diffuse" pain, and to order a bone scan. (Id.).

The bone scan was performed on August 3, 1992, and resulted in a normal finding. Dr. Gupta then saw plaintiff on August 18, 1992, and noted that she had reported some relief of her headaches from Inderal, which he had prescribed at her last visit. (Id. at 312). She did not complain much of joint pain but reported that physical therapy had worsened her condition and that she had therefore stopped it after two sessions. (Id.).

15

Plaintiff was seen again by Dr. Gupta on September 15, 1992. She reported some improvement in the severity of her headaches but had frequent upper back and neck pain for which she sought medication. (Id.). At her next visit, on October 21, 1992, plaintiff reported frequent headaches -- eighteen in one month -- despite taking Inderal. (Id. at 313). Her neck pain, however, was temporarily improved with Tylenol #4. (Id.).

Plaintiff did not appear for her next scheduled appointment on December 4, 1992, and was not seen again by Dr. Gupta until December 22, 1993, more than one year later. (Id. at 313-14). At that time, she reported intense and frequent headaches, with associated eye pain and blurred vision, which were not relieved by Inderal. (Id. at 314). She reported having been seen by Dr. Garfinkel in the interim (although the record does not contain records from him), and having undergone a CT scan of the head and facial bones, the report from which is not included in the record, and she reported that it showed possible sinusitis. (Id.). She also complained of "blank spells," and reported that her husband had noticed that her eye was twitching, although she had no recollection of that event and was suffering from poor memory. She also reported pain along her entire spine. (Id.). On examination Dr. Gupta found tenderness along the cervical, thoracic and lumbar

16

spines. Her range of motion of the cervical spine was full but painful, and the lumbar spine was "painful in all directions." Dr. Gupta also noted crepitus in the shoulder. (Id.).

It appears that the balance of the doctor's notes from this December 22 visit, including Dr. Gupta's impressions and plans, are missing from the transcript. The sheet of notes ends with the results of Dr. Gupta's physical examination but does not refer to "impressions" or "plans," which are the last listed categories in all of his other sets of notes. The next page starts with a subsequent visit, on January 11, 1994. (Id. at 315). From that point on, plaintiff visited Dr. Gupta regularly each month through August 1994. (Id. at 315-18). At the January 1994 visit, plaintiff complained of headaches, which were not controlled by Elavil, "blank spells" -- although none had occurred in the past two weeks and an EEG proved normal -- and severe back pain unremediated by Prednisone. Dr. Gupta therefore increased her dosages. (Id.).

On February 9, 1994, Mrs. Baron reported severe daily headaches, as well as vomiting on one occasion, and ongoing back pain, for which she was taking Tylenol #4. (Id. at 315). Dr. Gupta again raised her dosages. (Id.). At the next visit, on March 15, 1994, plaintiff reported the same complaints, although she noted

17

that the headaches were somewhat less severe than the prior month, presumably because of the increased Elavil dosage. (<u>Id.</u> at 316). The doctor again increased the Elavil dosage. (<u>Id.</u>). Her April 22, May 20 and June 20, 1994 visits featured the same complaints, as well as a reference to forgetfulness and an allergic reaction to one of the medications. In each case, the doctor adjusted her medications. (<u>Id.</u> at 316-17).

On the July 22, 1994 visit, plaintiff reported the continuation of the headaches and back and neck pain. She did report, however, that on the occasion of a very severe headache she had taken an injection of Immitrex, and it had quickly relieved the symptoms. (<u>Id.</u> at 318). The next month, on August 22, 1994, Mrs. Baron reported continued severe headaches, for which she twice took Immitrex, but reported that it did not help and that she had vomited after one of the injections. As for her back and neck pains, they remained unchanged, and she said that warm weather made the pain worse. (<u>Id.</u>).

The next entry for Dr. Gupta in the transcript is for a visit by plaintiff on September 8, 1995, more than one year after the immediately preceding documented examination. (<u>Id.</u> at 319). It does not appear that this was in fact plaintiff's next visit to the

18

doctor, as the September 8 entry contains no reference to a long
time lapse -- a type of notation that Dr. Gupta made on the prior
occasion when he had not seen plaintiff for more than one year (Id.
at 314) -- and the September 8 notes are worded as if the doctor
had continued to see her in the recent past.[6] In any event, she
still complained of headaches, which were daily occurrences; neck
and low-back pain, which was "somewhat worse now," and for which
the prescribed medication was ineffective; and persistent mood
swings. She was apparently taking Paxil for this condition (not
previously referred to by Dr. Gupta in any notes in the
transcript), and she reported that when she had gone off it for a
few days she had started to cry. (Id. at 319).

Dr. Gupta's last entry was November 3, 1995, when plaintiff
and her husband decided to end treatment by him. (Id.).[7] As
described by the doctor, Mrs. Baron was crying, and the doctor

---

[6] For example, he notes that, with regard to "neck & lowback
pain," plaintiff complained of "somewhat more pain now," and
mentions that a particular medication -- Ultear -- "was not
helpful." Similarly, he observes that her mood swings "persist."
He also recites that plaintiff had stopped taking Paxil for a few
days -- a medication not previously mentioned in his notes. (Tr.
319).

[7] In the notes, Dr. Gupta seems to indicate that plaintiff
and her husband were upset because she had been denied Social
Security benefits, but that event had occurred some years
earlier.

19

recounted "P[atien]t claims that she did not 'refuse' to see a psychiatrist but only did not want to go to Dr. Hartman. She believes that I should have specifically sent her to another psychiatrist." (Id. at 320). This discussion is cryptic and refers to events not reflected in any of the records now in the agency transcript. Indeed, the notes of Dr. Gupta that are before us make no other reference to any psychiatrist or to a suggestion or request by Dr. Gupta that plaintiff see such a specialist.

The November 3, 1995 notation in Dr. Gupta's notes ends by confirming that plaintiff's husband had accused the doctor of being a "pill pusher." It also states that the parties had agreed to end the treating relationship, and that plaintiff would seek another doctor. (Id. at 319).

The record does not reflect further treatment of plaintiff for the conditions that Dr. Gupta was treating for quite a few years, whether because she was seeing no one or because the records are incomplete. We note that there are also clinical records, possibly by Dr. Garfinkel, from 1990 (one entry) and a series of entries from 1993, all referring to headaches, back pains, and sinus

20

difficulties. (Id. at 324-25).[8] In any event, in the interim she underwent surgery twice by a Dr. Pagan-Newland in 1996 for a sinus condition. (Id. at 184-86, 190-92, 278-301).

The next record of pertinent treatment comes from the VA,[9] where plaintiff was seen in April 2002 for an eye exam, possibly as a result of her complaints of headaches with ocular auras or blurriness. The examination found nothing physically amiss in her eyes (id. at 443-46), although on her next visit, on May 20, 2002, she was prescribed eyeglasses. (Id. at 442).

The next treatment reflected in the transcript is from April and May 2003. (Id. at 239-41). Dr. Garfinkel reported to SSA's New York State affiliate that he had not seen plaintiff in three years, until he saw her on April 3, 2003 and then again on May 5, 2003. (Id. at 240). We see no contemporaneous notes of these two visits, or indeed of any visits to Dr. Garfinkel in the 1990's, but following the April 3, 2003 visit, Dr. Garfinkel referred plaintiff

---

[8] The table of contents of the SSA transcript incorrectly assigns these pages to the 1991 initial report of Dr. Gupta. Most of the entries post-date Dr. Gupta's report by several years, and Dr. Gupta's own notes are found in a separate section and in a different handwriting.

[9] Plaintiff's husband is a former member of the Armed Forces. (Tr. 928).

for MRI scans of her neck and lower back, which were taken on April 22, 2003. (Id. at 242-44). We further infer that plaintiff's renewed visits to her internist at that stage were triggered by SSA's notification to her that she was a Stieberger class member and hence eligible for further consideration of her disability claims.

The April 22, 2003 scan report for the cervical spine indicates that plaintiff's disks showed normal height and signal intensity, with no indication of bulging, protrusion or herniation. As for the vertebral bodies, while of normal height and signal intensity, they reflected some osteophyte formation at C5 and C6 "which may compromise the exiting nerve root at that level." (Id. at 244). As for the lumbar spine, the MRI revealed a central bulging of the disk at L4-L5, together with osteophyte formation at that level. According to the report these two developments contributed to "the effacement of the thecal sac." (Id. at 242). In addition, the report noted that the disk at that level was desiccated and that osseous overgrowth and ligament hypertrophy had led to canal constriction at that level. There also was some canal constriction at the L3-L4 level. In all other respects, the lumbar spine was normal. (Id.).

22

Based on these findings and, presumably, as a result of plaintiff's complaints of pain, on May 5, 2003 Dr. Garfinkel referred her to a spinal surgeon for an evaluation. (Id. at 240). Plaintiff was apparently seen by such a surgeon, though that doctor's notes are not in the record. According to a history later taken at the VA, the surgeon recommended surgery but Mrs. Baron did not follow up on it. (Id. at 435). In any event, apparently based on the condition documented by the MRIs on April 22, 2003, Dr. Garfinkel diagnosed her as suffering from "cervical and lumbar disk disease" as well as migraines. (Id. at 237). The ALJ ultimately found Mrs. Baron to have become disabled as of that date -- April 22, 2003. (Id. at 483).

Plaintiff returned to the VA for various reasons between late 2003 and at least 2008. Of pertinence to her cited maladies, she was seen on January 20, 2004 for complaints of frequent severe headaches, pain in her right elbow and left wrist, and numbness of both arms at night. (Id. at 438).[10] The assessment by a Dr. Muhammad Rehmani listed the spinal conditions previously documented and also

---

[10] The notes in this respect are confusing since the cited page lists these current complaints whereas another page of notes from the same visit says that plaintiff had no complaints. (Tr. 436 (patient described as "asymptomatic"); id. at 437 (patient reportedly describes "generally good health")).

cited carpal tunnel syndrome. (Id.).

Plaintiff returned to the VA on April 27, 2004, complaining principally of neck and back pain, as well as arm numbness. She further described having had these symptoms for about twenty years. (Id. at 435). Dr. Steven Renzoni diagnosed cervical radiculopathy and carpal tunnel syndrome. (Id.).

Plaintiff was next seen at the VA on June 4, 2004 for abdominal pain. (Id. at 430-35). Subsequent visits and tests on June 10 and July 30, 2004 (id. at 427-30) led to diagnoses of bilateral cervical and lumbosacral radiculitis without radiculopathy, responding to her complaints of pain in her back with radiating pain down her legs, as well as neck pain radiating to her arms and mild left side carpal tunnel syndrome. (Id. at 427). She was also referred for acupuncture for these pains and her headaches. (Id. at 428).

Plaintiff underwent a series of acupuncture sessions starting in August 2004, and reported that they had offered at least some temporary relief from back pain. (Id. at 377-78, 400-04, 415-17, 419-26). Nonetheless, throughout plaintiff's treatment at the VA, she complained of continuing back pain and headaches, which the

24

doctors described as chronic. (E.g., id. at 405-06, 412-15). Eventually, after being placed on Depakote for her headaches, she reported significant improvement. (Id. at 401-02) (Nov. 24, 2004 visit to VA).

On December 9, 2004, plaintiff underwent a psychiatric evaluation at the VA Mental Health Clinic by Nurse Practitioner ("NP") Michele Paradiso. (Id. at 378-79). The notes state that Mrs. Baron was uncertain why she had been referred for this consultation and denied a history of mental illness, but she reported a long history of mood swings. According to the plaintiff, when depressed she lacks energy and motivation, cries a lot, cannot concentrate and "worries all the time." With a change in mood, which can occur "within minutes," she has "excessive energy," accompanied by too rapid talking and racing thoughts. Both she and her husband, who accompanied her to the interview, reported improvement in mood swings since she had been taking Depakote. (Id.).

As for her family history, she reported the fact that her father had committed suicide, and she became tearful in referring to this fact. She also mentioned that her mother had been killed by a drunk driver, that all three of her children with Mr. Baron had seizures, that one had been diagnosed with Asperger's Syndrome,

that another had been diagnosed with ADHD, and that she herself had seizures. (Id.). She apparently did not mention that she and her first child had been subjected to sexual abuse by the child's grandfather, as she and her husband testified at the ALJ hearing in 2008.

Based on the interview, the NP diagnosed plaintiff with a mood disorder, more specifically citing a Bipolar II disorder. She listed plaintiff as oriented but with poor insight and fair judgment. (Id. at 379). On the five-stage diagnosis axis, she listed the bipolar condition at Axis I; on Axis III she specified peripheral neuropathy, carpal tunnel syndrome, low back pain, anemia, and headaches; at Axis IV she recited "severe" and cited "combined family, chronic psychiatric disorders in 3 children, unresolved grief over father's suicide"; and at Axis V she listed a possible GAF of 45. (Id.).[11] She also specified proposed steps to alleviate plaintiff's condition, including prescription of anti-depressants. She noted, however, that plaintiff was "reluctant" to undertake treatment at the VA Mental Health Clinic. (Id.).

---

[11] A person with a GAF score between 40 and 50 exhibits "serious symptom... or any serious impairment in social;, occupational or school functioning (e.g. ... unable to keep a job)." APA, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 2000).

26

Plaintiff continued to be treated by the VA, but there is no indication of any follow-up at the Mental Health Clinic, although she continued to complain about her physical condition. (E.g., id. at 370). A cervical MRI in March 2005 found both diffuse degeneration of the disks and an osteophyte formation at C5-C6 with mild central canal stenosis and mild to moderate bilateral foraminal stenosis, reflecting some small degeneration from the April 22, 2003 MRIs. (Id. at 667). The next year an EMG study led to a formal diagnosis that plaintiff suffered from carpal tunnel syndrome (id. at 666), and she underwent surgery for that condition in her left wrist on March 27, 2008. (Id. at 647-51).

C. SSA Consultants' Reports

Since plaintiff filed her initial applications for benefits in 1990, the SSA has obtained reports from a number of examining and non-examining consultants pertaining to her physical status and her mental condition. We briefly summarize their findings.

On May 11, 1990, Dr. Stanley Mandell performed a neurological examination of plaintiff. (Id. at 86, 88). This examination took place before she started treatment with Dr. Gupta.

27

Dr. Mandell reported that she had described having fallen in 1980, leading to a history of back pain since that time. (Id. at 86). She recited that her pain was so intense that she needed a pillow to sit in the tub, that she has discomfort when lying on either side, that she could walk only one block before needing to rest, that she could not do housework, that she felt dizzy when rising from a sitting position, that she suffered from blurred vision and had lost consciousness on one occasion, and that she had some shortness of breath and "weakness" in her hand. (Id.).

In the doctor's evaluation, he described Mrs. Baron as "a sad but alert and cooperative lady." (Id.). He reported, after all of the physical and motor tests, that she was neurologically intact, although he did not specify any ranges of motion. (Id. at 86, 88).

On June 21, 1990, a state agency non-examining physician, Dr. Judith Bodnar, reviewed the then-available medical record for SSA, although it is not clear from the record what data she referred to, other than Dr. Mandell's report. Given the presumably limited scope of information then in the SSA file, she listed the primary complaint as headaches (id. at 26) and mentioned among Mrs. Baron's issues a recent difficult pregnancy, as well as blurred vision. (Id. at 26-27). She listed plaintiff's exertional capacities as

28

occasional lifting of up to 20 pounds, frequent lifting of as much as ten pounds, an ability to stand or walk six hours in an eight-hour day, an ability to sit for up to six hours in such a day, and an unlimited ability to push or pull. In addition, she stated that Mrs. Baron could "occasionally" climb stairs, balance, stoop, kneel, crouch, and crawl. (Id. at 28). Dr. Bodnar added, in a cryptic comment, "no organicity on mental status" and reported -- presumably parroting Dr. Mandell's finding -- that plaintiff's gait, heel-to-toe walk, her ability to get on and off an examining table, and the motor and sensory exams were all normal. (Id. at 27). The doctor also reported no manipulative or visual limitations, although she did mention plaintiff's reports of occasional blurred vision when suffering a headache, and one blackout. (Id. at 29, 30).

A similar report was prepared several months later by another state agency non-examining physician, Dr. Richard Blaber. His report, dated October 1, 1990 (before plaintiff was referred for treatment to a neurologist) was also based on his review of the documentation that SSA had at the time and is non-specific as to what he reviewed. His physical functional-capacity findings, not surprisingly, repeat those of Dr. Bodnar (indeed, in parts, word for word), except that he ruled out climbing and balancing because

29

of reported dizziness, and his findings are presumably based, as were Dr. Bodnar's, on Dr. Mandell's earlier report. (Id. at 40-45). He also went on to state explicitly that plaintiff was capable of performing "a wide range of light work which does not involve exposure to hazards." (Id. at 45).

The remaining consultant reports to the SSA were prepared in March and April 2003, following plaintiff's invocation of her right to reconsideration under Stieberger and shortly before the April 22 scan reports that led the ALJ to find her disabled as of that date. We summarize each report.

Dr. Raja Jagtiani undertook a physical examination of Mrs. Baron on March 18, 2003 (id. at 228-31) which led him to note significant limitations in her ability to perform certain movements, including ranges of motion, potentially consistent with her reported history of back pain from her neck to her lumbosacral spine, with shooting pains into her legs. Specifically, he noted that she had difficulty with heel-to-toe walk and with crouching. (Id. at 229). He further reported that her cervical spine had flexion only to 25 degrees, extension to 10 degrees, rotation to 30 degrees bilaterally, and lateral flexion to 20 degrees. He noted paracervical spasm bilaterally, though her thoracic spine appeared

normal. As for her lumbosacral spine, flexion was to 40 degrees, extension to 10 degrees, lateral flexion to 20 degrees bilaterally, and rotation to 20 degrees bilaterally. Her straight leg raising when sitting was positive at 40 degrees; while lying on the right side, it was positive at 40 degrees; and while on the left side, it was positive at 30 degrees. Her shoulder forward elevation was 120 degrees bilaterally, adduction 20 degrees bilaterally, internal rotation 30 degrees bilaterally and external rotation 60 degrees bilaterally. Her hip flexion/extension was 70 degrees bilaterally, her internal rotation was 30 degrees bilaterally, her exterior rotation was 30 degrees, her backward extension was 20 degrees, her abduction was 20 degrees, and her adduction was 10 degrees. All other ranges of motion were normal. (Id. at 230).

Based on a radiology report from the same day (id. at 232), Dr. Jagtiani noted a disk space narrowing at L4-L5 and a straightening of the lumbar lordotic curve. (Id. at 231). He made no findings as to plaintiff's exertional physical capacities, but offered as diagnoses cervical pain, back pain syndrome, migraines and IBS.[12] (Id. at 231).

_____

[12] The reference to IBS was apparently based on plaintiff's report of hospitalizations in the late 1970s for that condition. (Tr. 228).

On the same day, plaintiff underwent a mental status examination by a psychologist, Dr. Leslie Halprin. (Id. at 233-36). In her history of the plaintiff, Dr. Halprin noted that Mrs. Baron reported having been unable to work since 1989 due to back pains, neck pains, and migraines. In the doctor's report, she made no reference to any possible history of psychiatric problems or any of the family circumstances existing in the 1980s or 1990s that might have affected Mrs. Baron's psychiatric status, but she did note that plaintiff had never undergone any psychiatric treatment. (Id. at 233). Since Dr. Halprin's examination and report appear to have been directed only to the plaintiff's status as of 2003, she included a section on "current functioning," noting plaintiff's report that she suffered from interrupted sleep, loss of appetite, dysphoric moods attributable to pain and an inability to engage in desired activities, anxiety, and difficulty in concentrating. (Id.).

In referring to plaintiff's medical history, Dr. Halprin -- who apparently did not review, or else ignored, the pertinent medical records -- mentioned only plaintiff's sinus treatments in the late 1990s, her reported treatments in the late 1970s for a spastic colon and IBS, and an appendectomy in 1976, and listed current medications and an unspecific reference to plaintiff

32

getting anti-depressants at some point in the past from her general practitioner. (Id. at 233-34).

As for Dr. Halprin's assessment of plaintiff, she noted that Mrs. Baron was dressed appropriately, well groomed, "fluent" and appropriate in oral communication, and "coherent and goal directed," while exhibiting no signs of paranoia, hallucinations, or delusions. She further stated that plaintiff was alert, oriented, and exhibiting a positive mood, and was capable of "appropriate speech and thought content." She also observed that plaintiff could count up to ten forwards and backwards and could do serial threes (i.e., counting downward by threes). (Id. at 234). As for memory skills, Dr. Halprin deemed them impaired as a result of "limited intellectual functioning" and found her cognitive ability to be below average. Nonetheless, she characterized plaintiff's insight and judgment as good. (Id. at 235).

The report went on to summarize plaintiff's then-current "mode of living." This included the ability to dress, bathe and self-groom, to cook, and to handle her own money, although Mrs. Baron's pains and headaches sometimes limited her ability to engage in household tasks. According to Dr. Halprin, plaintiff does not socialize but reported that she had a "fine" family relationship,

33

presumably with her husband and her three children with him, all of whom were then teenagers. Although Mrs. Baron liked going to malls and watching her children's sports events, she reported that she cannot do so as a result of her physical problems. She spends her time watching television, napping, walking through the house, and doing such chores as she could consistent with her maladies. (Id. at 235).

Dr. Halprin concluded that plaintiff was able to understand and follow simple instructions, to perform simple rote functions, to maintain concentration and attention, to undertake "several complex tasks" with others, to relate to others, and to deal with stress. As for the five-axis diagnostic assessment, Dr. Halprin listed as a diagnosis at Axis 1 an adjustment disorder with a moderate episodic depressed mood. At Axis 2 she listed "rule out borderline intellectual functioning," and at Axis 3 she listed only IBS and spastic colon. She did not address the remaining two axes. (Id. at 235).

After noting that "examination results are inconsistent with allegations" (id.) -- a somewhat cryptic comment that may have been intended to amount to a finding that plaintiff was psychologically able to work -- Dr. Halprin went on to say that plaintiff's medical

34

condition should be evaluated to determine whether she was capable of employment. She also stated that vocational assessment and training may be appropriate. (Id. at 236). Finally, she listed plaintiff's prognosis as "good, given above treatments." (Id.). It is unclear from the text, however, to what treatments she was referring.

In the wake of these various assessments, SSA obtained still another report from a non-examining consultant, this time a state agency psychiatrist, Dr. James Albert.[13] In his report, dated April 7, 2003, Dr. Albert considered solely the plaintiff's then-current condition and did so, apparently, principally to confirm whether plaintiff's mental status equaled or exceeded one of the listed impairments under the SSA regulation addressing per se disability. (See id. at 216).

His diagnosis, offered without explanation, was "adjustment disorder, episodic." (Id. at 207). As for functional limitations, he found none in daily living or social functioning. He also noted that plaintiff had reported no instances of repeated episodic decompensation. The only limitations he cited were a "moderate"

---

[13] For reasons unclear, the agency transcript lists this document as the work of Dr. James Ipert. (Tr. 3).

problem with concentration, persistence, and pace, and a moderate limitation on setting realistic goals and independently making plans. (Id. at 214, 218-19).

In the only textual passage in the report, the doctor alluded to plaintiff's high-school diploma and her ability to handle her finances, as well as the lack of any prior psychiatric treatment and her insistence that her disability is related to her physical maladies. According to the doctor -- presumably relying on the report of Dr. Halprin -- "[h]er mental abilities exam is notable for a lack of serious limits." He went on to reiterate the prior diagnosis of "adjustment disorder with depressed mood episodic." (Tr. 216). On that stated basis, he opined that she had "the mental residual capacity associated with the ability to sustain work in a competitive workplace." (Id.).

D. Dr. Gupta's 2008 Report

On October 9, 2008, at the request of plaintiff's attorney, plaintiff's treating neurologist from 1991 through 1995, Dr. Gupta, filled out a detailed SSA form that sought his assessment of plaintiff's physical capacities during the period when he had treated her. (Id. at 541-47). This report was based on Dr. Gupta's

review of his copious treating notes from that period. (Id. at 861).

He first listed his diagnoses, which included acute low-back pain, as well as pain in her neck and entire spine, shoulder pain, and intractable migraine headaches. (Id. at 541). He listed her medications as including Elavil, Inderal, Sansert, Esgic, Immitrex, Ansaid, Tylenol#4, and Prednisone. (Id.). As for side effects of these medications, he noted that Elavil caused drowsiness and Sansert caused rashes. (Id.). He also mentioned that physical therapy had not relieved the plaintiff's symptoms. (Id.).

Asked for clinical findings that supported his diagnoses, he cited tenderness at the lumbosacral spine and the sciatic notch, the noted limitations on plaintiff's ranges of motion -- that is, that flexion of the lumbosacral spine was painful at 60 degrees, and that lateral bending was painful at 20 degrees -- and tenderness at the C-7 level and the left shoulder. (Id. at 542). As for her symptoms, he also mentioned her "very frequent headaches," her "chronic" pain in her spine and shoulder, and numbness in her legs. (Id.). In assessing plaintiff's physical exertion capacity, when asked for how long plaintiff could sit, stand or walk in an eight-hour day, Dr. Gupta estimated that she could sit for two

37

hours, stand for 30 minutes, and walk for 30 minutes. (Id.). He further reported that, while sitting, she needed to change positions after 30 minutes, that she could stand at one time for up to ten minutes, and that she could walk for as much as 30 minutes. (Id.). He found that she could not use either foot or leg to push or pull on a sustained basis. (Id. at 543). He also estimated that, during an eight-hour day, she would have to sit or lie down once or twice for 15 minutes to a half-hour because "any sustained activity would hurt her spine." (Id.).

As for plaintiff's ability to lift and carry objects, Dr. Gupta reported that she could frequently lift or carry up to ten pounds, occasionally lift or carry up to 15 pounds, rarely lift or carry up to 25 pounds, and never lift or carry more. (Id.). He said that she could use her hands and arms to grasp, turn or twist objects for fine manipulations and for feeling and reaching, but that she could not use them for the pushing or pulling of arm controls. (Id. at 544). Questioned about the location of pain, he listed bilateral pain in plaintiff's lumbosacral, cervical, and thoracic spines, and her head and shoulders, with occasional pain radiating to her legs. (Id.). Precipitating factors causing pain, according to the doctor, included movement, overuse or exertion, static position, and stress. As for "positive objective signs of

38

the  Patient's  pain,"  he  listed  tenderness,  crepitus,  and
significant limitations in the range of motion in the lumbosacral
spine. (Id.). The form also asked for the effects of the pain, and
he mentioned that she had "subjectively [complained of] 'blackout'
and poor memory." (Id. at 545). He opined as well that the pain
would  "often"  interfere  with  plaintiff's  attention  and
concentration. (Id.). As for various physical activities, he opined
that plaintiff could not crawl, could only "rarely" twist, squat,
crouch, bend, stoop, and climb ladders, and could climb stairs
"occasionally." (Id.).

The form asked whether the patient could do sedentary or light
work activities, as defined by SSA regulations, and Dr. Gupta
reported that she could not. (Id. at 546). He also mentioned, as an
additional comment, that apart from Mrs. Baron's pain in her spine
and shoulders, she suffered from "persistent headaches which did
not respond to any medications or treatments." (Id. at 547).

E. Dr. Rehmani's 2008 Report

In further support of plaintiff's application, in December
2008, Dr. Rehmani prepared a work-capacity evaluation covering the
period from January 24, 2004 to the end of 2008. (Id. at 807-12).

39

He estimated that in an eight-hour day plaintiff was capable of sitting, standing, and walking for a total of less than one hour each. He further specified that she would be limited to sitting at one time for 15 minutes, standing at one time for 20 minutes and walking for 30 minutes. (Id. at 808). He further found that she would need to lie down at times during a work day, that she could "rarely" lift up to five pounds, but no more, that she could not, on a regular basis, grasp, turn or twist objects, perform fine manipulations, feel with her left hand and arm, reach overhead, push or pull arm controls, crawl, twist, squat or crouch, bend or stoop, or climb stairs or ladders. (Id. at 808-09).

Having specified the impact of plaintiff's conditions, notably her neck, back, and leg pains, and carpal tunnel numbness and pain in the hands, Dr. Rehmani specified a number of "objective signs" of that pain. These included interrupted sleep, reduced appetite, sensory loss, tenderness, muscle atrophy, muscle weakness and spasm, and limits on ranges of motion. (Id. at 810). He further listed symptoms as dizziness, occasional blackouts, headaches, and loss of concentration. (Id. at 811). He also cited plaintiff's emotional problems as contributing factors. Thus, he noted that stress, anxiety, and depression increased her pain, and that the pain interfered constantly with her concentration and attention.

(<u>Id.</u>). He concluded that she was unable to work. (<u>Id.</u>).


F. <u>The ALJ's Decision</u>


In the decision rendered by ALJ Katz, he noted that plaintiff last met the insurance requirements on December 31, 2003. (<u>Id.</u> at 476). Applying the five-step analysis mandated by 20 C.F.R. §§ 404.1520 and 416.920, he found that plaintiff had not engaged in substantial gainful activity since January 12, 1989, and that she suffered from severe impairments involving migraine headaches and "neck/back/leg problems." (<u>Id.</u> at 478). He further found (1) that she did not suffer from any impairment that would be <u>per se</u> disabling under the so-called listing regulations of 20 C.F.R. § 416.920(d), (2) that, prior to April 22, 2003, she had possessed the ability to perform the full range of what the SSA regulations define as "light exertion level work," and (3) that, as of April 22, 2003, she no longer had that ability to perform even sedentary work. (<u>Id.</u>).


In reaching these conclusions, the ALJ recited that during the period of Dr. Gupta's treatment of plaintiff, he had found no clinical basis for her complaints of pain, and that the first time that there was an objective diagnosis consistent with her reports

41

of back pain was in April 2003, when MRIs showed osteophyte formation possibly impacting the nerve root at C5-C6, and a disk bulge at L4-L5 with canal tightening and intrusion on the thecal sac. (Id. at 478-80). The ALJ further rejected, as unreliable, the 2008 written report of Dr. Gupta that, as of the time that he had treated plaintiff in the first part of the 1990s, she had been unable to engage in full-time work activities. (Id. at 481-82). As for plaintiff's complaints of chronic migraine headaches, the ALJ ascribed the severity of this condition to her pregnancies, purportedly because, while pregnant, she could not take medications that otherwise helped relieve the pain. (Id. at 479).[14]

The ALJ proceeded then to determine whether, during the earlier period, there had been jobs in the national economy that plaintiff had been able to perform. In doing so, he found that prior to April 22, 2003, she could sit, stand and walk for six hours each, and lift and carry up to twenty pounds, whereas after April 21 she could lift and carry only ten pounds and could only "occasionally" perform fine manipulations. (Id. 482). He then applied the so-called Grid regulations to his determination that until April 22 she was able to do a full range of light-exertion

_____

[14] The ALJ cited the 1991 decision of ALJ Harap in support of this finding. (Tr. 479).

42

work, and concluded that the regulations dictated a finding that she was not disabled during the earlier period. (Id. 482-83).

III. Plaintiff's Claims

In seeking to overturn the adverse decision of the SSA, plaintiff presses eight criticisms of the analysis of the ALJ. First, she asserts that the ALJ failed to consider the combined effects of her various maladies -- notably pain and mental illness -- and substituted his lay opinions for those of the doctors. (Pl. Mem. 15-21). Second, she argues that the ALJ did not properly assess the question of the onset date for plaintiff's status as a disabled person. (Id. at 21-22). Third, she contends that the ALJ did not properly apply the treating physician's rule to the findings of Dr. Gupta. (Id. at 22-25). Fourth, she claims that the ALJ did not adequately explain his refusal to find her per se disabled. (Id. at 25-26). Fifth, she says the ALJ erred in applying the criteria for making credibility assessments. (Id. at 26-27). Sixth, she challenges the ALJ's findings regarding her residual functional capacity. (Id. at 27). Seventh, she criticizes the ALJ's reliance on the grid regulations to find that she was not disabled. (Id. at 28). Finally, she insists that the evidence demonstrates that she was disabled as early as 1989 and, hence, suggests that

the court should order the payment of benefits. (Id.).


ANALYSIS


We first summarize the pertinent legal standards and then
address the adequacy of the record to sustain the SSA decision
denying benefits prior to April 22, 2003. Because we find that some
of plaintiff's criticisms are valid and because there are certain
apparent gaps in the record -- even if not cited by plaintiff -- we
conclude that the case should be remanded to the SSA for further
proceedings.


I. Standards for Benefits Eligibility


In order to qualify for disability insurance benefits, a
claimant must "demonstrate that she was disabled as of the date on
which she was last insured." Behling v. Comm'r of Soc. Sec., 369 F.
App'x 292, 294 (2d Cir. 2010) (citing 42 U.S.C. § 423(a)(1)(A)).
For purposes of eligibility for benefits, an applicant is
"disabled" within the meaning of the Act if she is unable "'to
engage in any substantial gainful activity by reason of any
medically determinable physical or mental impairment which can be
expected to... last for a continuous period of not less than 12

44

months.'" <u>Carroll v. Sec'y of Health & Human Servs.</u>, 705 F.2d 638,
641-42 (2d Cir. 1983) (quoting 42 U.S.C. § 423(d)(1)(A)).[15] The Act
requires that the relevant physical or mental impairment be "'of
such severity that [plaintiff] is not only unable to do h[er]
previous work but cannot, considering h[er] age, education, and
work experience, engage in any other kind of substantial gainful
work which exists in the national economy.'" <u>Butts v. Barnhart</u>, 388
F.3d 377, 383 (2d Cir. 2004) (quoting 42 U.S.C. § 423(d)(2)(A)). If
the claimant can perform substantial gainful work existing in the
national economy, it is immaterial, for purposes of the Act, that
an opening for such work may not be found in the immediate area
where she lives or that a specific job vacancy may not exist. 42
U.S.C. § 423(d)(2)(A). The same criteria apply to applications for
SSI benefits. <u>See</u>, <u>e.g.</u>, <u>Reyes v. Barnhart</u>, 2004 WL 439495, at *4
(S.D.N.Y. Mar. 9, 2004); <u>Rodriguez v. Barnhart</u>, 2002 WL 31307167,
at *5 (S.D.N.Y. Oct. 15, 2002).

    In assessing a claim of disability, the Commissioner must
consider: "(1) objective medical facts; (2) diagnos[e]s or medical

---

[15] "Substantial gainful activity" is defined as work that
"[i]nvolves doing significant and productive physical or mental
duties" and "[i]s done (or intended) for pay or profit." 20
C.F.R. § 404.1510; <u>see</u>, <u>e.g.</u>, <u>Craven v. Apfel</u>, 58 F. Supp. 2d
172, 183 (S.D.N.Y. 1999); <u>Pickering v. Chater</u>, 951 F. Supp. 418,
424 (S.D.N.Y. 1996).

opinions based on those facts; (3) subjective evidence of pain and disability testified to by claimant and other witnesses; and (4) the claimant's background, age, and experience." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 259 (2d Cir. 1988). The SSA regulations set forth a five-step sequential process under which an ALJ must evaluate disability claims. 20 C.F.R. §§ 404.1520(a)(4)(I)-(v). The Second Circuit has described this sequential process as follows:

> First, the Secretary considers whether the claimant is currently engaged in substantial gainful activity. If [s]he is not, the Secretary next considers whether the claimant has a "severe impairment" which significantly limits [her] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Secretary will consider h[er] disabled without considering vocational factors such as age, education, and work experience; the Secretary presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [s]he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform h[er] past work, the Secretary then determines whether there is other work which the claimant could perform.

Bush v. Shalala, 94 F.3d 40, 44-45 (2d Cir. 1996) (emphasis in original) (quoting Rivera v. Schweiker, 717 F.2d 719, 722-23 (2d

Cir. 1983)).

Plaintiff bears the burden of proof on the first four steps, but the Commissioner bears the burden on the fifth step, that is, demonstrating the existence of jobs in the economy that plaintiff can perform. See, e.g., Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009). Normally, in meeting his burden on this fifth step, the Commissioner may rely on the Medical-Vocational Guidelines contained in 20 C.F.R. Part 404, Subpart P, Appendix 2, commonly referred to as "the Grid[s]." Zorilla v. Chater, 915 F. Supp. 662, 667 (S.D.N.Y. 1996).[16] If, however, plaintiff suffers from non-exertional limitations,[17] exclusive reliance on the Grids is

---

[16] "The Grid classifies work into five categories based on the exertional requirements of the different jobs." Zorilla, 915 F. Supp. at 667 n.2. "Specifically, it divides work into sedentary, light, medium, heavy and very heavy, based on the extent of requirements in the primary strength activities of sitting, standing, walking, lifting, carrying, pushing, and pulling." Id. Based on these factors, the SSA uses the Grids to evaluate whether the claimant can engage in any other substantial gainful work that exists in the economy. Id. at 667.

[17] "An exertional limitation is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only a claimant's ability to meet the strength demands of jobs (i.e., sitting, standing, walking, lifting, carrying, pushing, and pulling)." Rosa v. Callahan, 168 F.3d 72, 78, n.2 (2d Cir. 1999) (citing Zorilla, 915 F. Supp. at 667 n.3). "'[L]imitations or restrictions which affect [a claimant's] ability to meet the demands of jobs other than the strength demands, that is, demands other than sitting, standing, walking, lifting, carrying, pushing or pulling, are considered non-

47

inappropriate. See Butts, 388 F.3d at 383 (citing Rosa, 168 F.3d at 78).


## II. Standard of Review


When a claimant challenges the SSA's denial of disability benefits, a court may set aside the Commissioner's decision only if it is not supported by substantial evidence or was based on legal error. Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (citing 42 U.S.C. § 405(g)); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998) (citing Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam)); see 42 U.S.C. § 405(g) (stating that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive").


"Substantial evidence" is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); see also Matthews v. Leavitt, 452 F.3d 145, 152 n.9

---

exertional.'" Samuels v. Barnhart, 2003 WL 21108321, at *11 n.14 (S.D.N.Y. May 14, 2003) (quoting 20 C.F.R. § 416.969a(a)); see also 20 C.F.R. § 404.1569a(c).

(2d Cir. 2006); Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004). The substantial-evidence test applies not only to the Commissioner's factual findings, but also to inferences to be drawn from the facts. E.g., Carballo ex rel. Cortes v. Apfel, 34 F. Supp. 2d 208, 214 (S.D.N.Y. 1999). In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight. See, e.g., Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); Williams, 859 F.2d at 258.

It is the function of the Commissioner, not the courts, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant. See Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cr. 1998); Carroll, 705 F.2d at 642. While the ALJ need not resolve every conflict in the record, Miles v. Harris, 645 F.2d 122, 124 (2d Cir. 1981), "the crucial factors in any determination must be set forth with sufficient specificity to enable [a reviewing court] to decide whether the determination is supported by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984); cf. Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999) (holding that claimant was entitled to an explanation of

why the Commissioner discredited her treating physician's disability opinion).

In addition to the consideration of the evidence in the record, a reviewing court must consider the ALJ's application of the law to the record before him. Even if the record, as it stands, contains substantial evidence of non-disability, the SSA decision may not stand if the ALJ committed legal error. Balsamo, 142 F.3d at 79.

Of particular importance, as disability benefits proceedings are non-adversarial in nature, the ALJ has an affirmative obligation to fully develop the administrative record, even when the claimant is represented by counsel. Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 508-09 (2d Cir. 2009); Casino-Ortiz v. Astrue, 2007 WL 2745704, at *7 (S.D.N.Y. Sept. 21, 2007) (citing Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996)). To this end, the ALJ must make every reasonable effort to help an applicant obtain medical reports from her medical sources. 20 C.F.R. §§ 404.1512(d), 416.912(d). More specifically, "[t]he record as a whole must be complete and detailed enough to allow the ALJ to determine claimant's residual functional capacity." Casino-Ortiz, 2007 WL 2745704, at *7 (citing 20 C.F.R. § 404.1513(e)(1)-(3)). The ALJ

50

must therefore seek additional evidence or clarification when the "report from [claimant's] medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1).

The ALJ must also adequately explain his reasoning in making the findings on which his ultimate decision rests, and in doing so he must address all pertinent evidence. See, e.g., Diaz v. Shalala, 59 F.3d 307, 315 (2d Cir. 1995); Ferraris, 728 F.2d at 586-87; see also Allen ex rel. Allen v. Barnhart, 2006 WL 2255113, at *10 (S.D.N.Y. Aug. 4, 2006) (finding that the ALJ explained his findings with "sufficient specificity" and cited specific reasons for his decision). "'It is self-evident that a determination by the [ALJ] must contain a sufficient explanation of [his] reasoning to permit the reviewing court to judge the adequacy of [his] conclusions.'" Pacheco v. Barnhart, 2004 WL 1345030, at *4 (E.D.N.Y. June 14, 2004) (quoting Rivera v. Sullivan, 771 F. Supp. 1339, 1354 (S.D.N.Y. 1991)). An ALJ's "'failure to acknowledge relevant evidence or to explain its implicit rejection is plain error.'" Kuleszo v. Barnhart, 232 F. Supp. 2d 44, 57 (W.D.N.Y. 2002) (quoting Pagan v. Chater, 923 F. Supp. 547, 556 (S.D.N.Y.

51

1996)).

The Act authorizes a court, when reviewing decisions of the SSA, to order further proceedings, as expressly stated in sentence four of 42 U.S.C. § 405(g): "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); Butts, 388 F.3d at 382. If "'there are gaps in the administrative record or the ALJ has applied an improper legal standard,'" the court will remand the case for further development of the evidence or for more specific findings. Rosa, 168 F.3d at 82-83 (quoting Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)). Remand is particularly appropriate where further findings or explanation will clarify the rationale for the ALJ's decision. Pratts, 94 F.3d at 39. If, however, the reviewing court concludes that an ALJ's determination to deny benefits was not supported by substantial evidence, a remand solely for calculation of benefits may be appropriate. See, e.g., Butts, 388 F.3d at 386 (discussing Curry v. Apfel, 209 F.3d 117 (2d Cir. 2000)).

52

III. <u>Assessment of the Record</u>

Plaintiff launches a plethora of criticisms of the ALJ's performance and also argues, albeit in abbreviated form, that the record evidence is so clearly supportive of her disability claim as to compel an outright judicial award of benefits. Some of these arguments hit wide of the mark, but under governing legal criteria, the record reflects a number of grounds for a remand based on legal error by the ALJ.

The challenged portion of the agency decision is the determination that, from 1989 through April 21, 2003, plaintiff was capable of a full range of light work, even though the ALJ concluded that by the next day she was incapable of either light work or a full range of sedentary work. (Tr. 482-83). In reaching this conclusion, the ALJ appeared to reject the notion that plaintiff was suffering from any meaningful non-exertional impairment, and concluded that the only significant limitations resulted from lumbosacral and cervical disk and osteophyte problems identified in two MRIs taken on April 22, 2003. (<u>Id.</u> at 480, 482). In rejecting the notion that plaintiff was affected at any time during the pertinent period by psychological difficulties that might have impacted her ability to work, the ALJ appeared to rely

53

principally on his own finding that, during her treatment by Dr. Gupta, she never mentioned that she needed psychiatric treatment and never referred to her alleged psychological problems, notwithstanding the vivid description of those difficulties in the hearing testimony of both plaintiff and her husband. (Id. at 481-82).[18] The ALJ further rejected the detailed findings of Dr. Gupta about plaintiff's exertional capacities and inability to work during the period from 1991 through 1995. In doing so, ALJ Katz asserted that Dr. Gupta's conclusions about these matters, embodied in a report dated 2008, were contradicted by his own contemporaneous notes made during the treating period. (Id.).

These various findings are infected with a range of errors, which we address below.

A. Completeness of the Record: Dr. Gupta's Notes

As we have observed, a careful reading of Dr. Gupta's contemporaneous treatment notes, as reprinted in the administrative transcript, indicates that they contain several unexplained gaps,

---

[18] It is less clear whether the ALJ also relied significantly on the 2003 consultant report of Dr. Halprin, who was focusing solely on plaintiff's state of mind as of that time.

including, most notably, a lack of entries for treatment between August 1994 and September 1995. (Id. at 318-19). That long gap may be quite significant since the next available entry, from September 8, 1995, contains cryptic references to what appears to have been a referral by Dr. Gupta to a psychiatrist and plaintiff's resistance to going to that doctor rather than to someone else. (Id. at 319).

Any gap in these records is potentially important, and particularly so because the ALJ relied on Dr. Gupta's notes as the basis for rejecting his conclusions, articulated in 2008, about plaintiff's residual functional capacity and her inability to work. The 1994-to-1995 gap in the notes is still more significant because the ALJ, in completely rejecting the possibility of a psychiatric or psychological disorder during the relevant period, relied on the purported failure of the plaintiff, during her treatment with Dr. Gupta, to mention any such problem (and, by implication Dr. Gupta's failure to suggest that she was suffering from psychological dysfunction). The fact that there appears to have been an effort by the doctor to have Mrs. Baron undergo either treatment or at least assessment by a psychiatrist surely undercuts the ALJ's premise, and the absence of notes fully reflecting the nature of that effort during the undocumented period underscores the significance of this

55

omission from the record.

B. Other Omissions from the Record

Apart from the gaps in Dr. Gupta's notes, we observe that the record contains virtually no documentation from Dr. Garfinkel, even though he was apparently plaintiff's treating internist or general practitioner beginning as early as 1989 and continuing at least through 2003, when he sent her for the MRIs that led the ALJ to conclude that plaintiff had become disabled on April 22, 2003. This omission is unexplained and potentially quite significant.

We know that Dr. Garfinkel treated plaintiff not only while she was seeing Dr. Gupta, to whom he had referred her in 1990 or 1991 (id. at 76, 92; see id. at 314 (on December 22, 1993, plaintiff reports to Dr. Gupta that she had seen Dr. Garfinkel and had a CT scan of head, showing sinusitis)), but also that he saw her later on. Indeed, Dr. Garfinkel specified in a May 9, 2003 note that he had not seen her in three years, indicating that he had seen her at least in or about sometime in 2000 and quite possibly in the immediately preceding period as well, following her termination of treatment by Dr. Gupta in late 1995. (Id. at 240). Given this indication, we would expect there to be medical records

56

reflecting Dr. Garfinkel's treatment and observations of Mrs. Baron, and yet the transcript contains no such documents and no explanation of why there are none.[19]

If Dr. Garfinkel was plaintiff's treating doctor during this period of time -- as he apparently was -- the ALJ had a duty to obtain the relevant records from him, as well as to obtain his evaluation and findings as to her work-related capacities during that time frame. There is no indication that the ALJ met these obligations.

### C. Failure to Address Pertinent Evidence

Apart from the apparent incompleteness of the record of contemporaneous treatment documents and the ALJ's failure to obtain an evaluation by Dr. Garfinkel, the ALJ's performance fell short in that his analysis and findings did not address a number of items of evidence actually contained in the record that contradicted, or at least seem in tension with, his findings.

---

[19] The table of contents of the transcript does refer to the unsuccessful efforts of the SSA to obtain records from at least two other treating sources. (See Tr. 3, Ex. B-21 & B-22).

To the extent that the ALJ rejected the notions that plaintiff suffered from a serious psychiatric condition at any relevant time, or that she was burdened with any non-exertional limitations, he relied solely on (a) the 2003 assessment of Dr. Halprin, and (b) the asserted absence of any indication that psychological issues had been raised in the course of Dr. Gupta's treatment of Mrs. Baron. This analysis fails in several respects.

First, the ALJ did not even mention, much less address, the findings of NP Paradiso, who diagnosed plaintiff as suffering from a bipolar disorder, citing "combined family, chronic psychiatric disorders in 3 children, unresolved grief over father's suicide," and an Axis V listing of a possible GAF of 45. (Id. at 378-79). Second, even Dr. Halprin found plaintiff to be suffering from an adjustment disorder with a moderate episodic depressed mood and suggested possible "borderline intellectual functioning," yet the ALJ ignored this finding as well. In this regard we note that even if a mental condition does not itself cause disability, the ALJ is required to consider the combined effects of all conditions, mental as well as physical, on the ability of the claimant to work. See Burgin v. Astrue, 348 F. App'x 646, 647 (2d Cir. 2009) (citing 20 C.F.R. § 404.1523). In this regard we further note that Dr. Halprin explicitly left open the possibility that plaintiff's physical

maladies -- depending on their severity -- could disable plaintiff,

and the implication was that these conditions might, in combination

with the adjustment disorder and depressed mood, cause such an

effect. Third, although Dr. Halprin, on whose findings the ALJ

relied, concluded that, at least in 2003, plaintiff was not

precluded by her psychological condition from working, her report

gives no indication that she was aware of, much less took into

account, the many family and medical circumstances that may have

contributed to plaintiff having serious psychological difficulties

earlier on.[20] In contrast, NP Paradiso evidently explored these

family and medical issues with Mrs. Baron, as reflected in her

report, and yet the ALJ made no allusion to this discrepancy, and,

indeed, completely ignored the Paradiso report.


Fourth, the fact that a claimant has not mentioned psychiatric

problems to a treating source does not itself demonstrate that she

is not suffering from them, as the ALJ appears to have assumed.

See, e.g., Cullison v. Califano, 613 F.2d 55, 58 (4th Cir. 1980).

---

[20] These circumstances include the sexual abuse of plaintiff
(never mentioned by the ALJ) and of her first child and the many
developmental difficulties of her three children with Mr. Baron.
They further include the behavior to which both Mr. and Mrs.
Baron testified -- that is, crying and screaming -- as well as
the effects of prolonged and chronic headaches and other physical
pains, whether organic or psychosomatic.

Fifth, as we have noted, even the seemingly incomplete notes of Dr. Gupta reflect that he had apparently referred plaintiff for psychiatric evaluation and/or treatment (Tr. 319), thus contradicting the ALJ's finding that psychological issues were not raised during the course of his treatment. These notes reflect the only direct medical evidence in the current transcript about plaintiff's mental state before 2003, and the ALJ's failure to address this information from plaintiff's treating neurologist is indefensible.

Sixth, in finding that plaintiff was able to perform a full range of light work before April 22, 2003, the ALJ claimed that Dr. Gupta had found no significant exertional limitations during the treating period -- as distinguished from his 2008 report, which referred to the treating period -- and ALJ Katz particularly cited a March 1991 finding by Dr. Gupta that plaintiff's straight leg raising while seated was within normal limits. (Id. at 478-79, 481). What the ALJ ignored, however, was a set of findings from the same report that noted significant limitations in other ranges of motion as well as other physical indicia of pain. These included observed tenderness in the lower lumbar and sacral areas, and on both sides of the sciatic notch, as well as significant limitations in forward flexion (with pain at 60 degrees) and in lateral bending

on both sides (at 20 degrees), as well as "positive Phalen's sign
and positive Tinel's sign on both sides," indicating carpal tunnel
syndrome. (Id. at 90). Moreover, although the ALJ seemed to ascribe
any physical problems noted at the time to plaintiff's pregnancy,
the doctor did not, and instead diagnosed plaintiff at that time
with chronic low-back pain, tentatively caused by "bilateral lumbar
radiculopathy or herniated disk," as well as "probabl[e] carpal
tunnel syndrome" and frequent migraine headaches. (Id. at 90).
Moreover, Dr. Gupta made similar findings in a number of later
examinations. (E.g., id. at 310 (noting tenderness and crepitus) &
314 (noting tenderness and lumbar pain "in all directions")), as
did at least one other treating doctor in the same period. (Id. at
334 (Dr. Bloom diagnosed "aggravated arthritis")). The ALJ ignored
all of these objective findings and diagnoses, as well as Dr.
Gupta's prescription of a variety of painkillers, in concluding (a)
that Dr. Gupta had found no significant physical limitations
between 1991 and 1995, and (b) that the doctor's 2008 physical
capacity report was inconsistent with his contemporaneous notes.
Again the ALJ failed to acknowledge and address evidence that
contradicted his findings.

D. The ALJ's Failure to Meaningfully Address
   the Date of Onset of Disability

The ALJ found that plaintiff had become disabled, within the meaning of the Act and SSA regulations, on April 22, 2003. That date was apparently fixed by him based on the fact that MRIs performed that day showed significant spinal dysfunction. In effect, then, the ALJ found that on April 21, 2003 plaintiff was not only not disabled, but able to perform a full range of light work, which includes the ability to "sit/stand/walk for a total of 6 hours for each activity in an 8-hour workday and lift/carry objects weighing a total of 20 pounds" (id. at 482), but that on the next day she was unable to perform any work, including a full range of sedentary labor that was available in adequate numbers in the national economy. This set of findings is clearly implausible on its face, since nothing occurred between April 21 and 22, 2003 other than the happenstance that the MRIs were done on the 22nd. The ALJ's unexplained reliance on that happenstance in setting the onset date was, in this context, error.

It is the obligation of the ALJ, when determining an onset date, to obtain necessary medical information, including the opinions of treating sources, on which to ground his findings. E.g., Wilder v. Chater, 64 F.3d 335, 336-37 (7th Cir. 1995); see

Telfair v. Chater, 2007 WL 1522616, at *5-6 (S.D.N.Y. May 15, 2007)
(quoting SSR 83-20 and noting that SSA should determine onset date
"from reasonable inferences based on the available medical
evidence"). The ALJ here made no such effort. Instead, he rejected
the findings of Dr. Gupta and ignored plaintiff's other principal
treating source for the period from 1989 to 2003 -- Dr. Garfinkel
-- whose records and opinions are not included in the agency
transcript. On this topic the ALJ also ignored the VA treating
sources, who had been seeing plaintiff since at least 2002, and
whose opinions about the onset of her various maladies, physical
and psychological, could have provided valuable information on
which to base a defensible finding. Finally, the ALJ also ignored
the SSA's own consulting doctors, who might have ventured an
estimate of a timeline for onset of the various back problems that
the ALJ found existed in sufficient severity when viewed by scans
on April 22, 2003. See id. at *6 (SSR 83-20 requires "medical
basis" and directs collection of "medical evidence," the use of a
medical adviser at a hearing, as well as reference, if needed, to
lay sources of relevant information); accord Gibson v. Astrue, 2009
WL 1181251, at *2 (S.D.N.Y. April 30, 2009); see also Temkin v.
Astrue, 2011 WL 17523, at *8 (E.D.N.Y. Jan. 4, 2012).

The ALJ's failure to undertake this effort in a case when the

onset date is plainly crucial to determining the amount of back benefits to which plaintiff was entitled was legal error and justifies a remand.


E. Misapplication of the Treating-Physician Rule


The treating-physician rule "requires an ALJ to grant special deference to the opinions of a claimant's treating physician." Acosta v. Barnhart, 2003 WL 1877228, at *10 (S.D.N.Y. Apr. 10, 2003); see also Kamerling v. Massanari 295 F.3d 206, 209 n.9 (2d Cir. 2002); Clark, 143 F.3d at 118. "A 'treating source' is defined as a claimant's 'own physician, psychologist, or other acceptable medical source who provides [claimant], or has provided [claimant], with medical treatment or evaluation, and who has, or has had, an ongoing treatment relationship with [claimant].'" Martinez v. Astrue, 2009 WL 2168732, at *12 n.26 (S.D.N.Y. July 16, 2009) (brackets in original) (citing 20 C.F.R. §§ 404.1502, 416.902). "The Commissioner 'may consider an acceptable medical source who has treated or evaluated [claimant] only a few times or only after long intervals (e.g., twice a year) to be [claimant's] treating source if the nature and frequency of the treatment or evaluation is typical for [claimant's] condition(s).'" Id.

SSA regulations require that the findings of a claimant's treating physician be afforded controlling weight over those of a non-treating physician -- and in particular, a non-examining physician -- when the treating physician's opinion is consistent with substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); see also Schisler v. Sullivan, 3 F.3d 563, 566 (2d Cir. 1993). However, "if a treating physician's opinion is either not well supported by medically acceptable clinical and laboratory diagnostic techniques or inconsistent with other substantial evidence in the record, it need not be afforded controlling weight." Valerio v. Comm'r of Soc. Sec., 2009 WL 2424211, at *11 (E.D.N.Y. Aug. 6, 2009) (quoting Perez, 77 F.3d at 48).

If the treating physician's opinion is inconsistent with other substantial evidence in the record, the ALJ must then consider four factors when determining the appropriate weight to give that opinion: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." Hartnett v. Apfel, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998); accord Halloran, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(d)(2)). An ALJ must not substitute his "own assessment of

65

the relative merits of the objective evidence and subjective complaints for that of a treating physician." Garcia v. Barnhart, 2003 WL 68040, at *7 (S.D.N.Y. Jan. 7, 2003).

The ALJ rejected the medical opinion of plaintiff's treating neurologist, Dr. Gupta, to the effect that plaintiff could not work during the period of his treatment of her from 1991 to 1995. (Tr. 481). The record reflects numerous visits by plaintiff to Dr. Gupta from March 1991 through November 1995 and, for reasons discussed, appears to omit a number of additional visits in 1994 and 1995. There is surely no question that this doctor is a fully qualified specialist with specific and extended familiarity with plaintiff's conditions during a large part of the relevant period. Moreover, although the ALJ at one point characterized the doctor as offering "a retrospective opinion" (id.), the doctor was in fact opining about the plaintiff's condition during the time when he was seeing her and making extensive contemporaneous notes of his examinations.

We have already noted the deficiencies in the ALJ's handling of Dr. Gupta's 2008 report about his treatment of her and her capacities between 1991 and 1995 -- including a failure to deal with gaps in the record, the ALJ's mischaracterization of Dr. Gupta's contemporaneous physical findings, his failure to

66

acknowledge clear evidence that Dr. Gupta had made a psychiatric reference for Mrs. Baron, and his ignoring of data and findings reflected in the doctor's notes that support plaintiff's allegations of pain and other physical limitations. In short, the ALJ's rejection of Dr. Gupta's opinion was based on premises that are either factually incorrect or, at least, inadequately explained.

In addition, to the extent that the ALJ thought that Dr. Gupta's 2008 report was inconsistent with his contemporaneous notes during treatment, he was obliged, before rejecting the proffered findings, to reach out to the doctor to give him an opportunity to explain any perceived contradictions. See 20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1). There is no indication in the record that the ALJ ever took such a step.

Given all of these errors, the ALJ's rejection of that doctor's findings about the plaintiff's functional capacity and her inability to work during the contested time period is unsustainable on the current record.

In addition to Dr. Gupta, Mrs. Baron was treated over an extended period of time -- from at least 1989 through at least 2003

67

-- by her internist or general practitioner, Dr. Garfinkel, and yet
the ALJ completely ignored that fact, obtaining no records and
requesting no opinions from him about his patient's condition at
any time during the relevant period. This too was error. As noted,
the ALJ is required to obtain all pertinent records of treatment,
and he failed to do so here. Moreover, the ALJ is required to
obtain a so-called medical source statement ("MSS") from treating
doctors, and the ALJ failed to seek one from Dr. Garfinkel.[21]

An MSS is a statement about a claimant's remaining abilities,
in light of his or her impairments, that is provided by the
claimant's medical source, and is to be based on the findings of
that medical source. SSR 96-5p, 1996 WL 374183, at *4.
"Adjudicators are generally required to request that acceptable
medical sources provide these statements with their medical
reports." (Id.). SSA regulations state that lack of an MSS, in and
of itself, does not render a record incomplete, 20 C.F.R. §
416.913(b)(6) (SSI regulation); 20 C.F.R. § 404.1513(b)(6) (DIB
regulation), but the regulations explicitly state that the SSA
"will request a medical source statement about what [the claimant]

---

[21] We note also that the ALJ did not seek an MSS from Dr.
Gupta either, but one was solicited and provided by plaintiff's
counsel. (Tr. 652-59).

can still do despite [the claimant's] impairment(s)." <u>Id.</u>
Therefore, the Commissioner should request an MSS from a claimant's
treating physician if one is not provided, even if the claimant's
medical history is otherwise complete and the claimant is
represented by counsel. <u>E.g.</u>, 20 C.F.R. § 416.913(b) (stating that
one's medical reports should include an MSS); <u>Johnson v. Astrue</u>,
811 F. Supp. 2d 618, 629 (E.D.N.Y. Sept. 16, 2011) (citing <u>Perez</u>,
77 F.3d at 47); <u>Robins v. Astrue</u>, 2011 WL 2446371, at *3 (E.D.N.Y.
June 15, 2011) ("Although [20 C.F.R. § 404.1513(b)(6)] provides
that the lack of [an MSS] will not render a report incomplete, it
nevertheless promises that the Commissioner will request one.");
<u>Outley v. Astrue</u>, 2010 WL 3703065, at *4 (N.D.N.Y. Aug. 26, 2010)
(citing 20 C.F.R. § 416.912(d) (explaining that the Commissioner
will "make every reasonable effort to help [a claimant] get medical
reports from [his or her] own medical sources")).


The ALJ had an affirmative duty to fully develop the record,
and his failure to attempt to procure an MSS from Dr. Garfinkel, as
well as his failure to obtain any treatment records from that
doctor merit remand, even though plaintiff may have been
represented by counsel. <u>Johnson</u>, 2011 WL 4348302, at *10; <u>Outley</u>,
2010 WL 3703065, at *4 (citing <u>Dickson v. Astrue</u>, 2008 WL 4287389,
at *13 (N.D.N.Y. Sept. 17, 2008)); <u>Ocasio v. Astrue</u>, 2009 WL

2905448, at *4 (S.D.N.Y. Sept. 4, 2009) (citing 20 C.F.R. §
404.1513(b)(6); 42 U.S.C. § 423(d)(5)(B)); see also Perez, 77 F.3d
at 47.

Finally, the record reflects a report from an additional
medical source, Michele Paradiso, a nurse practitioner. (See Tr.
378-79). The ALJ ignored NP Paradiso's stated opinions in reaching
his disability conclusion even though, as a summary and analysis of
plaintiff's psychiatric status in 2003, it had the potential to
cast meaningful light on her condition during the immediately
preceding period of time.

As a nurse practitioner, Ms. Paradiso is admittedly not an
"acceptable medical source" for purposes of establishing
plaintiff's medically determinable impairments." See 20 C.F.R. §
404.1513(a)(1)-(5). However, in determining the degree of
plaintiff's functional limitations, the ALJ may consider evidence
from "other sources," which explicitly include "nurse-
practitioners." 20 C.F.R. § 404.1513(d)(1). Moreover, a court may
review the ALJ's decision not to do so. For example, in White v.
Commissioner, the court concluded that the ALJ had erred in not
giving appropriate weight to claimant's social worker as "other
source"-evidence, particularly "given that [she] had a regular

70

treatment relationship with plaintiff." <u>White v. Comm'r of Soc. Sec.</u>, 302 F. Supp. 2d 170, 176 (W.D.N.Y. 2004); <u>accord</u> <u>Mongeur v. Heckler</u>, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (stating that the opinion of a treating nurse practitioner "is entitled to some extra consideration"); <u>Sweat v. Astrue</u>, 2011 WL 2532932, *9 (N.D.N.Y. May 23, 2011) ("[W]hile an 'other source' opinion is not treated with the same deference as a treating physician's opinion, the assessment is still entitled to some weight, especially when there is a long-standing treatment relationship with the claimant."); <u>Pogozelski v. Barnhart</u>, 2004 WL 1146059, at *12 (E.D.N.Y. May 19, 2004) ("although not a physician, and thus not entitled to the level of deference accorded under the 'treating physician rule,' some weight should still have been accorded to [plaintiff's treating therapist]'s opinion based on his familiarity and treating relationship with the claimant."); <u>Mejia v. Barnhart</u>, 261 F. Supp. 2d 142, 148 (E.D.N.Y. 2003) ("Although a psychotherapist's report is not an 'acceptable medical source'... as the report of a primary treatment provider, [the psychotherapist's] report should have been accorded more than a 'little' weight as 'an other medical source' pursuant to 20 C.F.R. 404.1513(d)(1).").

In this case, it is true that NP Paradiso saw plaintiff only once, apparently because plaintiff resisted psychiatric treatment,

71

as she had apparently done consistently throughout the pertinent period. That said, the Paradiso report reflects a degree of familiarity with plaintiff's relevant family and medical history that far outstrips that of Dr. Halprin, who is the only other source of an explicit evaluation of plaintiff's psychiatric status, at least on the current record.

Although the ALJ is entitled to accord less weight to NP Paradiso's's opinions since she is not an "acceptable medical source," there is no indication that he sought or considered her findings about plaintiff's symptoms at all. Therefore, on remand, the ALJ should address NP Paradiso's opinions insofar as they are potentially relevant to the severity of plaintiff's psychological problems prior to April 22, 2003.

F. The ALJ's Assessment of Plaintiff's Credibility Regarding Her Subjective Pain and Mental Status

The ALJ exercises discretion over the weight assigned to a claimant's testimony regarding the severity of her pain and other subjectively perceived conditions and her resulting limitations. See, e.g., Schultz v. Astrue, 2008 WL 728925, at *12 (N.D.N.Y. Mar. 18, 2008) (citing Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979); Snell, 177 F.3d at 135). Where the ALJ's findings are

supported by substantial evidence, a reviewing court must uphold the ALJ's decision to discount plaintiff's testimony. See Marcus, 615 F.2d at 27 (citing Richardson, 402 U.S. at 401).

Nonetheless, the ALJ's discretion is not unbounded. The Second Circuit has held that throughout the five-step process, "'the subjective element of [plaintiff's] pain is an important factor to be considered in determining disability.'" Perez v. Barnhart, 234 F. Supp. 2d 336, 340 (S.D.N.Y. 2002) (quoting Mimms v. Heckler, 750 F.2d 180, 185 (2d Cir. 1984)); see also 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3) ("We will... consider descriptions and observations of [a claimant's] limitations from [his or her] impairment(s), including limitations that result from [his or her] symptoms, such as pain, provided by [that claimant]"). In assessing the claimant's testimony, the ALJ must take all pertinent evidence into consideration. E.g., Perez, 234 F. Supp. 2d at 340-41; see also Snell, 177 F.3d at 135 (stating that an ALJ is in a better position to decide credibility than the Commissioner). Even if a claimant's account of subjective pain is unaccompanied by positive clinical findings or other objective medical evidence,[22] it may

---

[22] Objective medical evidence is "evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1529(c)(2); see also Casino-Ortiz, 2007 WL 2745704, at *11, n.21 (quoting 20 C.F.R. §

still serve as the basis for establishing disability as long as the impairment has a medically ascertainable source. See, e.g., Harris v. R.R. Ret. Bd., 948 F.2d 123 (2d Cir. 1991) (citing Gallagher v. Schweiker, 697 F.2d 82, 84-85 (2d Cir. 1983)).

SSA regulations outline a two-step framework under which an ALJ must evaluate a claimant's subjective description of his or her impairment and related symptoms. 20 C.F.R. §§ 404.1529, 416.929; see also SSR 96-7p, 1996 WL 374186, at *6-9 (July 2, 1996) (summarizing framework). "First, the ALJ must consider whether the claimant has a medically determinable impairment which could reasonably be expected to produce the... symptoms alleged by the claimant." Martinez, 2009 WL 2168732, at *16 (alteration in original) (citing McCarthy v. Astrue, 2007 WL 4444976, at *8 (S.D.N.Y. Dec. 18, 2007)); see also 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1). "Second, the ALJ must 'evaluate the intensity and

_____

404.1529(c)(2)). Laboratory findings "are anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques. Some of these diagnostic techniques include chemical tests, electrophysiological studies (electrocardiogram, electroencephalogram, etc.), roentgenological studies (X-rays), and psychological tests." 20 C.F.R. § 404.1528(c).

persistence of those symptoms considering all of the available evidence.'" Peck v. Astrue, 2010 WL 3125950, at *4 (E.D.N.Y. Aug. 6, 2010) (citing 20 C.F.R. § 404.1529(c)); accord Meadors v. Astrue, 370 F. App'x 179, 183 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(c)(3)(i)-(vii)) & Taylor v. Barnhart, 83 F. App'x 347, 350-51 (2d Cir. 2003)). "To the extent that the claimant's 'pain contentions are not substantiated by the objective medical evidence,' the ALJ must evaluate the claimant's credibility." Peck, 2010 WL 3125950, at *4 (citing 20 C.F.R. § 404.1529(c)); see also Meadors, 370 F. App'x at 183-84 (citing 20 C.F.R. § 404.1529(c)(3)(i)-(vii); Taylor, 83 F. App'x at 350-51). It should be noted that "the second stage of [the] analysis may itself involve two parts." Sanchez v. Astrue, 2010 WL 101501, at *14 (S.D.N.Y. Jan. 12, 2010). "First, the ALJ must decide whether objective evidence, on its own, substantiates the extent of the alleged symptoms (as opposed to the question in the first step of whether objective evidence establishes a condition that could 'reasonably be expected' to produce such symptoms)." Id. "Second, if it does not, the ALJ must gauge a claimant's credibility regarding the alleged symptoms by reference to the seven factors listed [in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3)]." Id. (citing Gittens v. Astrue, 2008 WL 2787723, at *5 (S.D.N.Y. June 23, 2008)). If the ALJ does not follow these steps, remand is

75

appropriate. <u>Id.</u> at *15 (citing 20 C.F.R. § 404.1529(c)).

When a claimant reports symptoms more severe than medical evidence alone would suggest, SSA regulations require the reviewing ALJ to consider specific factors in determining the credibility of a claimant's symptoms and their limiting effects. SSR 96-7p, 1996 WL 374186, at *2. These factors include: (1) an individual's daily activities; (2) the location, duration, frequency and intensity of pain or other symptoms; (3) factors that precipitate and aggravate those symptoms; (4) the type, dosage, effectiveness, and side effects of medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, that the individual receives or has received for pain or other symptoms; (6) measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3); <u>see also</u> <u>Bush</u>, 94 F.3d at 46 n.4; <u>Wright v. Astrue</u>, 2008 WL 620733, at *3 (E.D.N.Y. Mar. 5, 2008) (citing SSR 96-7p).[23]

_____

[23] SSR 96-7p states, in pertinent part, "in recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 C.F.R. sections 404.1529(c) and 416.929(c) describe the kinds of evidence, including the factors below, that the adjudicator must consider in addition to

Finally, "'[o]nly allegations beyond what is substantiated by medical evidence are to be subjected to a credibility analysis... [because requiring] plaintiff to fully substantiate [his] symptoms with medical evidence would be both in abrogation of the regulations and against their stated purpose." Martin v. Astrue, 2009 WL 2356118, at *10 (S.D.N.Y. July 30, 2009) (citing Castillo v. Apfel, 1999 WL 147748, at *7 (S.D.N.Y. Mar. 18, 1999)).

In this case plaintiff testified to continuing severe pain in the form of headaches and both neck and lower-back pain, as well as occasional shooting pain down her legs, and some numbness and pain in her arms or hands. Moreover, her testimony as to the extent of the pain and its impact was corroborated by her husband, who described her as screaming about the pain, occasionally banging her head against the wall and expressing a desire for death, and even vomiting on occasion (a symptom consistent with migraine headaches).[24] It bears further noting that her treating neurologist found confirmatory signs of pain and hand numbness -- in the form

_____

the objective medical evidence when assessing the credibility of an individual's statements."

[24] See Mayo Clinic, Migraine, (June 4, 2011), available at http://www.mayoclinic.com/health/migraine-headache/DS00120/DSECTION=symptoms.

77

of limits on ranges of motion, tenderness at various points of the anatomy, spasms, and objective carpal tunnel tests. He also diagnosed conditions that could be expected to cause both her back pain and the stated problems with her hands and wrists.

In view of that record, the ALJ's assessments of plaintiff's credibility and that of her husband fell short in several respects. First, he never made any explicit credibility assessment of plaintiff, and addressed only in conclusory fashion the credibility of her husband, remarking that his account of his wife's travails and behavior was inconsistent with the absence of an equivalent report in Dr. Gupta's notes. (Tr. 481). Second, as we have noted, the ALJ misstated the findings of Dr. Gupta during treatment and ignored test reports that supported at least the existence of some degree of pain and other discomfort in her neck, back, and arms. Third, the ALJ did not address plaintiff's extensive use of pain medications, most of which apparently had no lasting ameliorative effect on her conditions, and he also did not address their side effects. Morever, although he noted that a few of those drugs had at least some effectiveness, he ignored the fact that they tended to provide only temporary relief, if any. (E.g., id. at 312-14 (Inderal helped at first and then did not), 315 (Prednisone did not relieve back pain), 318 (Immitrex quickly relieved headache but on

later occasions it did not)). The ALJ also ignored the fact that years had passed before a doctor was able to find an effective pharmaceutical choice for a number of her conditions.[25] In addition, the ALJ ignored the impact of side effects from some of these medications, including drowsiness, dizziness, and rashes. (E.g., id. at 317, 318).

The ALJ also failed to address the remaining pertinent criteria, including plaintiff's daily activities, which were very limited for an extended period of time during the pertinent years; the location, duration, frequency, and intensity of her pain and numbness; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of the medications that Mrs. Baron was taking or had been taking to alleviate pain; treatments other than medication that plaintiff had attempted -- including physical therapy and acupuncture -- for relief of pain; measures other than treatment that plaintiff used (e.g., lying flat on her back in the bathroom); and any other factors concerning her functional limitations and restrictions.

---

[25] For example, it appears that Depakote had a significant beneficial effect on plaintiff's migraine headaches, but this was apparently not prescribed until 2004. (Tr. 401-02).

In the ALJ's decision, he did not meaningfully address these criteria -- although he referred to the supposed beneficial effect of one medication (id. at 479) -- and instead he simply characterized Dr. Gupta's contemporaneous findings as inconsistent with the intensity of pain that plaintiff reported. That simple assertion was an inadequate analysis under the governing regulations.

Finally, we note that the ALJ erred in discounting the effect of plaintiff's diagnosed chronic migraine headaches. The ALJ ascribed these complaints to her pregnancies, asserting that during them she could not take medications, which supposedly relieved the symptoms. (Id. at 479). This causal diagnosis fails for several reasons. First, it is inconsistent with the record, since there are repeated entries noting that various medications either did not relieve the headaches or did so only temporarily. (E.g., id. at 312-14, 315-18). The first indication of more than transient relief is found in 2004, when plaintiff was taking Depakote, which apparently had not been previously prescribed, and she reported significant (though not total) relief. (Id. at 401-02). Second, the ALJ's analysis fails because he engaged in the sort of assessment that is for a doctor, not a lay person, to undertake. See Rosa, 168 F.3d at 81-82. In this case, the treating doctors consistently

80

diagnosed chronic and uncontrolled vascular headaches, and the consulting doctors did not disagree. The only source cited by ALJ Katz for his pregnancy-related theory is ALJ Harap and his 1991 decision, but ALJ Harap is obviously not a medical source.

### G. Combined Effects of Multiple Conditions

"The Commissioner is required to 'consider the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity' to establish eligibility for Social Security benefits." Burgin, 348 F. App'x at 647 (alteration in original) (quoting 20 C.F.R. § 404.1523). "'[T]he combined effect of a claimant's impairments must be considered in determining disability; the [Commissioner] must evaluate their combined impact on a claimant's ability to work, regardless of whether every impairment is severe.'" Id. (alteration in original) (quoting Dixon v. Shalala, 54 F.3d 1019, 1031 (2d Cir. 1995)). In this case there is support in the record for a finding that for extended periods of time during the pertinent fourteen-year interval, plaintiff suffered from a number of physical and emotional problems, and that these various conditions had the potential, in combination, to impose a far more acute set of limitations on her ability to work

81

for periods in excess of one year than would have been the impact of any one of them. These included not only lumbar-sacral impingement and cervical limitations with associated pain, as well as occasional shooting pains in the lower extremities, but migraine headaches, numbness in plaintiff's hands and wrists, occasional abdominal pains, some depression, and bipolar symptoms.

The ALJ was of course not required to credit the evidence of all of these various conditions, but, in effect, his analysis focused solely on the lower back condition, which he found to have become disabling only in April 2003. This mode of analysis amounts to a dismissal of all of the other cited conditions, or, alternatively, a failure to take their cumulative effect into consideration when determining that, until April 22, 2003, plaintiff was able to perform a full range of light work. Since the ALJ does not offer a specific basis for disregarding or rejecting all of the other conditions, his mode of analysis is deficient in not accounting for their effect on plaintiff. See, e.g., Wilson v. Barnhart, 2005 WL 1787581, at *2 (E.D.N.Y. July 21, 2005) (citing SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996); 20 C.F.R. § 404.1523) ("[I]n assessing a claimant's [residual functional capacity]... the ALJ must consider the limitations and restrictions imposed by all of an individual's impairments, without regard to

82

whether any such impairment, if considered separately, would be severe" and expressly directing the Commissioner to "collectively consider the effect of all of plaintiff's claimed disabilities... in reaching a determination regarding her ability to perform substantial gainful work existing in the economy" on remand because the ALJ's decision "[did] not make clear whether [the ALJ] considered the combined effects of plaintiff's eczema and arthritis in assessing her work capacity.").

H. Improper Use of the Grid Regulations

If plaintiff shows that her impairment renders her unable to perform her past work -- in this case that fact is established by the ALJ's finding that plaintiff did not have a relevant past history of work (Tr. 482) -- the burden then shifts to the Commissioner to show that there is other gainful work in the national economy that plaintiff could perform. See Carroll, 705 F.2d at 642 (citing Berry, 675 F.2d at 467); Campbell v. Sec'y of Health & Human Serv., 665 F.2d 48, 51 (2d Cir. 1981). In attempting to demonstrate the availability of such work, the ALJ, however, misapplied the Medical-Vocational guidelines ("the Grids") in determining that there were a significant number of jobs in the national economy for which plaintiff qualified, prior to April

2003, given her functional impairments.

Generally speaking, if plaintiff suffers only from exertional limitations, the Commissioner may satisfy his burden by resorting to the Grids. Rosa, 168 F.3d at 82. However, "where significant nonexertional impairments are present at the fifth step in the disability analysis...'application of the grids is inappropriate.'" Id. (quoting Bapp v. Bowen, 802 F.2d 601, 605-06 (2d Cir. 1986)). A non-exertional impairment is "[a]ny impairment which does not directly affect [the strength demands of work such as] the ability to sit, stand, walk, lift, carry, push, or pull. This includes impairments that affect the mind, vision, hearing, speech, and use of the body to climb, balance, stoop, kneel, crouch, crawl, handle, and use the fingers for fine activities." Casino-Ortiz, 2007 WL 2745704, at *13 (citing SSR 83-10).[26]

This Circuit has held that when non-exertional impairments

---

[26] According to the Regulations, examples of non-exertional limitations or restrictions include: 1) difficulty functioning because of nervousness, anxiety, or depression; 2) difficulty maintaining attention or concentration; 3) difficulty understanding or remembering detailed instructions; 4) difficulty in seeing or hearing; 5) difficulty tolerating some physical feature(s) of certain work settings, e.g., dust or fumes; or 6) difficulty performing the manipulative or postural functioning of some work such as reaching, handling, stopping, climbing, crawling, or crouching. 20 C.F.R. § 404.1569a(c)(1).

"'significantly limit the range of work permitted by [plaintiff's] exertional limitations,'" the Grids will not accurately determine disability status because they fail to take into account non-exertional impairments. Bapp, 802 F.2d at 605 (quoting Blacknall v. Heckler, 721 F.2d 1179, 1181 (9th Cir. 1983) (per curiam)). In such circumstances, the Commissioner "must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which [plaintiff] can obtain and perform." Id. at 603.

In this case, the ALJ considered, at least in general terms, plaintiff's residual functional capacity, age, education, and work experience prior to April 22, 2003 in conjunction with the Grids, and concluded that during that time plaintiff could perform a "full range of light work," and that there were "a significant number of jobs in the national economy that [plaintiff could have performed." (Tr. 482). The ALJ relied exclusively on the Grids to conclude that plaintiff was "not disabled" during the period from 1989 to April 21, 2003. (Id. at 482-83). However, the problem with his conclusion is that he ignored the record evidence of non-exertional limitations, and also made no finding -- much less a defensible and articulated finding -- that Mrs. Baron did not suffer from such limitations.

85

This omission was error in light of the evidence in the record. Apart from psychological issues reflected in the record, we note that there is evidence of side effects from some of the medications, as well as other such limitations, including headaches, blurriness of vision, and balance issues that led even the SSA consulting doctors to say that plaintiff must be limited in, or precluded from, pushing, pulling, climbing, crouching, and other similar activities. Similarly, even a consulting psychiatrist for SSA found that plaintiff suffered from moderate problems with concentration, persistence, and pace. (Id. at 218-19).

If this evidence is credited -- and the ALJ offered no reason not to do so -- plaintiff did suffer from a number of non-exertional limitations that presumably significantly limited the range of work that she could perform, which means that the ALJ may not exclusively rely, as he did, on the Grids to determine that there are jobs in the national economy that plaintiff can fill. These non-exertional limitations must be considered by the ALJ in order to evaluate their effect on plaintiff's ability to work.

Because the ALJ erroneously concluded, based solely on the Grids, that plaintiff was not disabled, and, in doing so, failed to acknowledge her non-exertional limitations, he also did not

86

consider whether a vocational expert was necessary in light of such limitations. Pratts, 94 F.3d at 39; see also Bapp, 802 F.2d at 606-07.[27] Accordingly, remand is necessary on this ground as well. Upon remand, the ALJ should first consider whether plaintiff's non-exertional limitations significantly diminished her ability to perform a "full range of [light and] sedentary work." Bapp, 802 F.2d at 605. If the ALJ so finds, then he is required to obtain testimony of a vocational expert or other similar evidence concerning the existence of jobs in the national economy, at the relevant time, for an individual with plaintiff's limitations. Bapp, 802 F.2d at 606.


IV. We Recommend Remand as the Proper Remedy


For the reasons that we have cited, the Commissioner's decision cannot stand. Under the Act, a reviewing court can order further proceedings when appropriate. "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); Butts, 388 F.3d at 384.

---

[27] It bears mention that the ALJ had such an expert available at the hearing, but chose not to call him. (Tr. 923, 956).

Remand is warranted where "'there are gaps in the administrative record or the ALJ has applied an improper legal standard.'" <u>Rosa</u>, 168 F.3d at 82-83 (quoting <u>Pratts</u>, 94 F.3d at 39); <u>cf.</u> <u>Butts</u>, 388 F.3d at 384. Remand is also appropriate where further findings or explanations will clarify the rationale for the ALJ's decision. <u>Pratts</u>, 94 F.3d at 39; <u>see</u> <u>also</u> <u>Butts</u>, 388 F.3d at 385.

If, however, the record provides "persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose," the court may reverse and remand solely for the calculation and payment of benefits. <u>Parker v. Harris</u>, 626 F.2d 225 (2d Cir. 1980); <u>see</u> <u>e.g.</u>, <u>Carroll</u>, 705 F.2d at 644 (where "reversal is based solely on the [Commissioner's] failure to sustain his burden of adducing evidence of [plaintiff's] capability of gainful employment and the [Commissioner's] findings that [plaintiff] can engage in 'sedentary' work is not supported by substantial evidence, no purpose would be served by remanding the case for a rehearing[.]"); <u>accord</u> <u>Balsamo</u>, 142 F.3d at 82.

The question remains whether the case should be remanded for further consideration, or simply for calculation of benefits, as plaintiff urges. Here, there exist some evidentiary gaps in the record, and the ALJ committed a number of legal errors. Therefore,

we conclude that further consideration is necessary. Remand for that purpose is particularly appropriate, as it would allow the ALJ to expand the record in pertinent areas, to articulate reasons, if any, for discounting the findings of treating sources or for discrediting plaintiff's description of her pain and other limitations, to consider the combined effect of plaintiff's impairments on her residual functional capacity, and to correct the other deficiencies that we have noted.

The alternative remedy of an order directing an award of benefits is not justified on the current record. Depending on the nature of any additional evidence procured by the ALJ to fill gaps in the record and his supplemental findings, it is conceivable that he may defensibly conclude that plaintiff was not disabled prior to April 22, 2003. Hence, we recommend that the court order remand for reconsideration rather than calculation of benefits.

## CONCLUSION

For the foregoing reasons, we recommend that defendant's motion for judgment on the pleadings be denied, and that the case be remanded to the Commissioner for further proceedings consistent with this opinion.

89

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable John G. Koeltl, Room 1030, 500 Pearl Street, New York, New York 10007-1312 and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York 10007-1312. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See Thomas v. Arn, 474 U.S. 140, 150 (1985), reh'g denied, 474 U.S. 1111 (1986); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: New York, New York
       March 4, 2013

MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE

90

Copies of this Report & Recommendation have been sent today to:

Irwin M. Portnoy, Esq.
Irwin M. Portnoy & Associates, P.C.
542 Union Avenue
New Windsor, New York 12553

Susan D. Baird, Esq.
Assistant United States Attorney
   for the Southern District of New York
86 Chambers Street
Third Floor
New York, New York 10007